## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

MATTHEW LAUZON,     )
    )
    Plaintiff     )
    )
vs.     )     Civil Action No. CV-16-cv-51-LEW
    )
STEPHEN DODD,     )
ROGER BEAUPRE, and     )
CITY OF BIDDEFORD     )
    )
    Defendants     )

## CITY DEFENDANTS' PARTIAL MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW IN SUPPORT

Defendants Roger Beaupre and City of Biddeford ("City Defendants") seek summary judgment and with the Court's consent (see ECF Nos. 136 and 137), limit this filing to three discrete issues. The City Defendants argue that the Plaintiff's complaint has been filed outside the statute of limitations and that no extended "accrual" period is warranted. Second, the actions of co-Defendant Dodd, the alleged sexual perpetrator, were not done "under color of law" and an action against the City Defendants cannot be sustained. Third, the conduct of Chief of Biddeford Police Roger Beaupre, sued in his individual capacity, did not violate the Plaintiff's constitutional rights and he is entitled to dismissal based on the doctrine of qualified immunity. Each issue will be discussed in turn.

### I. Plaintiff's Claims are Barred by the Statute of Limitations

#### A. Overview and Factual Background

In Plaintiff's Complaint, filed on October 29, 2015 in the Maine Superior Court, York County, (ECF No. 3-1) Lauzon alleged three separate counts against the City Defendants. Two of those counts alleged violations of 42 U.S.C. § 1983 were carried forward in the Plaintiff's Amended Complaint. (ECF No. 45). Count II alleges civil rights violations against Chief Beaupre individually. Count III makes an entity liability claim against Chief Beaupre in his official capacity and the City of Biddeford

for their purported failure to train/supervise/discipline the co-Defendant, Stephen Dodd.  The City Defendants renew their legal challenge related to the statute of limitations[1] with the benefit of completed discovery and an extensive factual record.

The City Defendants' dismissal is grounded on three particulars.  First, the Plaintiff's claim is outside the 6-year statute of limitations which expired on ▮▮▮▮▮▮▮, the six-year anniversary of his reaching the age of majority.  He failed to pursue his claim with "reasonable diligence" during the period of limitations, *see, e.g., Marrapese v. Rhode Island*, 749 F.2d 934, 943 (1st Cir. 1984), in part, because he made a personal decision not to pursue his sexual abuse claim until age 30.   Second, an extended accrual period or the "discovery rule" is not available to him where the evidence establishes that the factual basis of his 2015 Complaint was not "inherently unknowable" *see, e.g., Attallah v. United States*, 955 F.2d 776, 780 (1st Cir. 1992), during the limitations period.  And third, renewing their claim on motion to dismiss with the completed discovery record, the lack of a viable constitutional liability finding against Dodd precludes liability against the City Defendants under applicable First Circuit precedent. *Nieves v. McSweeney*, 241 F.3d 46, 50 (1st Cir. 2001).  Following the factual background, each legal claim will be explored in turn.

The Plaintiff has alleged that his sexual abuse by co-Defendant Dodd occurred at various points of time, ranging from ages 13 to 16.  (SMF 36-43 and 126-131).  Plaintiff reached the age of majority on January 13, 2003 during his senior year in high school. (SMF 1 and 353). In October 2014, Lauzon made contacts with the Maine State Police and the BPD to report his sexual abuse by a neighbor, Michael McKeown and Dodd. (SMF 7 and 389-390).

---

[1] City Defendants filed a motion to dismiss Plaintiff's Amended Complaint because the statute of limitations applicable to federal and civil right claims has expired.  (ECF No. 19).  After initial briefing, (ECF Nos. 33, 39), Judge Hornby made a preliminary ruling (ECF No. 41 at 12-13) that the lack of a developed factual record precluded definitive action on the City Defendants' statute of limitations defense at the Rule 12 (b)(6) stage.  Plaintiff's claim that fraudulent concealment tolled the statute of limitations was rejected.  (ECF No. 41 at 12-13, n. 7; *Lauzon v Dodd*, 2016 WL 3906618 *4 (July 14, 2016)).  Judge Hornby ordered additional briefing on the *Nieves* issue (ECF No. 41 at 13-15) and declined to apply the *Nieves* rule given factual distinctions between Nieves and the undeveloped record on Rule 12(b)(6) here. (ECF No. 56).

Lauzon had previously denied to BPD officers that he had been abused by McKeown during a July 2000 investigation of McKeown's activities. (SMF 36-61 and 66-116). Lauzon blamed his "very homophobic" father for his false statements to BPD. (SMF 100-105). Lauzon's father died in May 2005, after which Lauzon felt liberated to speak about his sexual abuse. (SMF 354). Yet, he made the conscious decision to confront Dodd only when he reached age 30, ███████████, claiming he was "laser focused" on accumulating as much wealth and power[2] as he could to accomplish his confrontation of Dodd. (SMF 355-357).

Between 2005 and 2014, Lauzon conceded he did "very little" and "kept a low profile" to investigate or pursue any claim against Dodd but maintains he was "extraordinarily focused" and was not "obsessed" by pursuit of this claim. (SMF 358-359). Yet, between 2005 and 2014, Lauzon was aware of other individuals coming forward with past claims of sexual abuse and he told close friends and family of his sexual abuse at the hands of both Michael McKeown and Dodd between 2005 to 2012. (SMF 361, 367, 372 and 379). Lauzon testified he didn't know why he didn't report Dodd's abuse between 2005 to 2010, but his conscious decision from 2005 forward to delay his confrontation with Dodd included not receiving mental health counseling until 2013. (SMF 356 & 380).

Between 2005 and 2014 Lauzon did not communicate with anyone connected with the BPD concerning Dodd. (SMF 352 and 365-366). This failure is part of a larger backdrop where, at the time of Dodd's alleged abuse, Plaintiff knew that Dodd was a BPD officer, "identified himself as a BPD officer when he offered to help [Plaintiff]," and allegedly Dodd "used his power and authority" as a

---

[2] In 2013, Lauzon made approximately $1.5 million dollars on "day trading" stocks toward his goal of accumulating as much wealth and power as he could to confront Dodd. (SMF 381). His success in 2013 made him "among the best day-traders in the world." (SMF 382). Lauzon testified that even though he had amassed $1.5 million in 2013 he did not have "personal confidence" to report his abuse. (SMF 383). In 2014, Lauzon lost approximately $1.5 million dollars day-trading. (SMF 384). Only after he lost $1.5 million and read an article in 2014 on sexual abuse by a fellow internet CEO, Razwana Birschir, and talked with her about starting his own survivor's organization, did he have the personal confidence to report his abuse. (SMF 385-388).

3

police officer to "sexually assault him and keep him from disclosing" the abuse.  (ECF Nos. 3-1, ¶ ¶ 13-15 and 45, ¶ 22).

To circumvent the statute of limitations, Plaintiff alleges that he "first discovered the involvement of Chief Beaupre and the City sometime in 2014/2015 during preliminary investigations into the claims made in this complaint." (ECF No. 45 ¶ 26 and SMF 396).  He first learned of Chief Beaupre's alleged involvement in a conspiracy or coverup of sexual abuse in late 2014 from former Biddeford Junior Firefighters John Drake and Jonathan Clark. (SMF 397-398).  Both men are high school contemporaries of Lauzon and describe themselves as his friends or acquaintances. (SMF 250-251, 278-279 and 399).  An examination of the information from Drake and Clark reveals that there was nothing "inherently unknowable" from these sources.  Indeed, Drake's information was based on a confabulation of his limited, personal involvement in events leading up to and during the MeOAG investigation of Dodd in 2002, his personal opinions based on their 2002 experiences, and speculation about things he had no personal knowledge and have now proven to be inaccurate. (SMF 400-410).[3] Similarly, the information from Clark was based on knowledge he claimed to have through the 2002

---

[3] Drake gave information to Lauzon in November 2014 alleging a cover-up by Chief Beaupre of Dodd misconduct motivated by a supposed sexual relationship between Dodd and Chief Beaupre. (SMF 399). Drake exchanged Facebook messages with Lauzon and others in 2014-2015 claiming Dodd had pictures of Beaupre's alleged homosexuality. (SMF 401).  Drake testified he has never seen the compromising pictures about which he posted on social media, and Dodd denied making such a claim to anyone. (SMF402-403). Plaintiff never produced any evidence concerning the existence of such photographs or videos. (SMF 401-403).  Yet, these bald allegations in the Amended Complaint played a significant role in the Court's denial of the Motion to Dismiss. (See ECF Nos. 41 at 5-6 and 56).

Drake's belief of a BPD coverup consisted of "awareness of Dodd and that he remained a police officer" after the MeOAG investigation, although he conceded he had no first-hand information concerning a conspiracy or a cover-up by Chief Beaupre in relation to Dodd.  (SMF 404-408). Drake believed Dodd continued to work as a police supervisor for 2 ½ years after he was served a notice in 2002 to have no contact with witnesses being interviewed by Pulire, including former Biddeford Junior Firefighters. (SMF 405).

Except for two days in October 2002, Dodd stopped reporting for work at BPD in September 2002 due to medical issues and retired in July 2003 without ever returning to work. (SMF 406). Drake conceded he had no information concerning what Chief Beaupre did in connection with Dodd's loss of law enforcement certificate. (SMF 408).  Drake also conceded he has no information concerning what Chief Beaupre knew about his (Drake's) allegations that Dodd violated the "no [witness] contact" order. (SMF 409 and 411).  Drake's 2015 belief was that Chief Beaupre was at fault for not enforcing the no contact order. (SMF 410).

MeOAG investigation of Dodd and his own interaction with Dodd in 2006 and his speculations about what Chief Beaupre knew or did.  (SMF 279-289, 292-307 and 417-428).[4]

Plaintiff also received hand-written statements and information from former BPD detectives Robert Devou and Terry Davis during the Spring of 2015.  Both statements and other information from Devou and Davis are personal recollections, opinions, and speculation about certain aspects of their time at BPD. (SMF: Devou- 432-440, 468, 542, 548 and 580; Davis– 262-264, 274-277, 299, 432-443, 573-574, 577, 583, 590, 656, and 660).  The record reveals that the information contained in these recollections were merely not known to the Plaintiff before he began his social media campaign in 2014-15 and did not contain anything "inherently unknowable" from these sources before ███████. (*Id.*)

Information from former BPD detective Devou, a handwritten letter he wrote in 2015 which was published in the local media and read to City of Biddeford officials, detailed, without personal knowledge, various views of the MeOAG investigation of Norman Gaudette and claims of favorable treatment received by Dodd.  (SMF 429, 430 and 432-434).[5]

Information from former BPD Detective Davis provided to Lauzon concerned the 1990-1991 MeOAG investigation of Gaudette and his extreme dissatisfaction with the prosecution efforts by

---

[4] Clark alleges he was sexually abused by Dodd in 1998 but denied any sexual interaction with Dodd when interviewed by MeOAG during the 2002 investigation. (SMF 292-295).  Clark told Drake of Dodd's abuse of him before either were interviewed by MeOAG in 2002, but Drake denied he knew anyone who had been abused by Dodd during his MeOAG interview. (SMF 287-289 and 412).  Clark made his allegations of a conspiracy and coverup public in a November 3, 2006 email to former Governor John Baldacci. (SMF 415-417). Clark testified he has no first-hand knowledge Chief Beaupre was involved in a cover-up or a conspiracy to protect Dodd. (SMF 422).

[5] Devou made various allegations based on hearsay concerning an alleged sexual interaction between Chief Beaupre and Gaudette, which were rebutted in an affidavit by Donna Hollman, Chief Beaupre's former spouse, and the testimony of Chief Beaupre and Gaudette. (SMF 436-437).  Devou asserted other opinions regarding Beaupre's alleged knowledge of complaints of sexual abuse of minors by Gaudette, but made no allegations against Chief Beaupre based on his personal knowledge involving the 2002-03 investigation of Dodd.  (SMF 438-439).  Devou's allegations about the 1989 Maine State Police investigation of the complaint against Dodd by his adult foster child Larry Carey were not based on personal knowledge and were contradicted by sworn testimony of those with knowledge. (SMF 440 and 526-548).  Devou's claims that Chief Beaupre altered internal affairs policies and other policies to protect Dodd, a factor in both the Amended Complaint and the Court's Decision on the Motion to Dismiss (ECF No. 41 at 6) have now proven to be without factual basis.  (SMF 659-668).

MeOAG, which resulted in a "no bill" returned against Gaudette. (SMF 573-590).[6]  Davis did not implicate Dodd in the alleged abuse of Lauzon. (SMF 261-264, 269 and 274-277).

## B.    Legal Argument

Although 42 U.S.C. § 1983 does not contain its own statute of limitations, the United States Supreme Court has held that statutes of limitations for Section 1983 actions are determined under state law.  *Board of Regents v. Tomanio*, 446 U.S. 478, 483 (1980).  In *Wilson v. Garcia*, the U.S. Supreme Court explained that Section 1983 operates "as a directive to select, in each State, the one most appropriate statute of limitations for all § 1983 claims." *Wilson v. Garcia*, 471 U.S. 261, 275 (1985). There is no dispute here (ECF No. 41, 8-9) that in the State of Maine, the general six-year statute of limitations governs civil rights actions.  *Small v. Inhabitants of City of Belfast*, 796 F.2d 544, 546-47 (1st Cir. 1986); *see also Douglas v. York County*, 433 F.3d 143, 144 (1st Cir. 2005) (applying Maine's general six-year statute of limitations to plaintiff's Section 1983 claim).

The rationale behind application of a statute of limitations is never more important than in a case such as Plaintiff's, which involves conspiracy and coverup claims extending back to the mid-1980s. The purposes served include fairness to the defendant and sound judicial administration based on the availability and reliability of evidence.[7]

In accordance with the six-year limitation, Plaintiff, whose date of birth is ▓▓▓▓▓▓, was required to bring his federal claims against the City Defendants no later than ▓▓▓▓▓▓, six years after reaching the age of majority, on ▓▓▓▓▓▓.  Plaintiff did not assert his federal causes of action until October 2015. Plaintiff attempts to overcome this procedural hurdle by urging the

---

[6] On March 31, 2015 Davis wrote to Lauzon on Facebook that former MeOAG AAG Eric Wright, who was assigned to oversee and prosecute the Gaudette investigation of 1990-91 "swept that case under the rug."  (SMF 441). Mainely Media reporters interviewed Davis and published a story quoting him claiming that the AAG Wright "admits he threw the case under the bus to the grand jury.  He swept the case under the rug." (SMF 442).

[7] Statutes of limitations represent "a judgment that it is unjust to fail to put an adversary on notice to defend within a specified period of time and the right to be free of stale claims in time comes to prevail over the right to prosecute them." *Kubrick,* 444 U.S. at 117.

Court to apply an accrual date or "discovery rule" to his claims. (See ECF 41 at 9-10). The City Defendants contend that the expanded post-discovery record demonstrates that the Plaintiff does not meet the standards to have the statute tolled by virtue of federal accrual caselaw, because he did not engage in "reasonable diligence" before the expiration of the statute of limitations, the factual basis he "first discovered" in 2014-15 did not rise to the level of "inherently unknowable" to toll the statute until twelve years after the start date of limitations, and the current lack of a viable constitutional liability finding against Dodd precludes liability against the City Defendants under applicable First Circuit precedent.

### 1. The Plaintiff Failed to Engage in "Reasonable Diligence" Before the Expiration of Limitations

The accrual period for a section 1983 cause of action is governed by federal law, *Delaware State College v. Ricks,* 449 U.S. 250 (1980), and begins to run when a plaintiff knows or has reason to know of the injury which forms the basis of the action. *Street v. Vose,* 936 F.2d 38, 39 (1st Cir. 1991); *Marrapese v. Rhode Island,* 749 F.2d 934, 936 (1st Cir. 1984), *cert. denied,* 474 U.S. 921. Stated otherwise, "[a] Section 1983 claim accrues when a plaintiff knows or has reason to know of his *injury*." *Poy v. Boutselis*, 352 F.3d 479, 483 (1st Cir. 2003) (emphasis added); *Nieves v. McSweeney*, 241 F.3d 46, 52 (1st Cir. 2001). The Supreme Court has clearly stated that, in an analogous inquiry, "the proper focus is on the time of the *discriminatory act,* not the point at which the *consequences* of the act become painful." *Chardón v. Fernández,* 454 U.S. 6, 8 (1981).

As the Court observed in *Rotella v. Wood,* 528 U.S. 549, 555 (2000), the "traditional federal accrual rule" is the "injury discovery" rule, under which "discovery of the injury, not discovery of the other elements, is what starts the clock." A plaintiff has "a duty to exercise reasonable diligence to investigate and protect his rights" within the limitations period. *Marrapese,* at 749 F.2d at 938. *See also McNamara v. City of Nashua,* 629 F.3d 92, 95 (1st Cir. 2011). As *Marrapese* observed, "[t]he Supreme Court [has] held that a plaintiff's ignorance of the existence of a legal right of action based on his

injury does not operate to delay accrual of his claim." *Id.* at 943 (citing *Kubrick v. United States*, 444 U.S. 111 (1979)).

How much knowledge must the Plaintiff have to trigger the running of the statute of limitations and the reasonable diligence inquiry? One does not have to possess actual knowledge of every element of the claim for it to accrue; instead, it accrues as soon as a plaintiff possesses "knowledge of the facts sufficient to put him on inquiry notice" of a possible claim. *Marrapese*, 749 F.2d at 937. A "plaintiff is considered to be on 'inquiry notice' when the first event occurs that would prompt a reasonable person to inquire into a possible injury at the hands of the defendant." *Epstein v. C.R. Bard, Inc.,* 460 F.3d 183, 187 (1st Cir. 2006); *Cascone v. United States,* 370 F.3d 95, 104 (1st Cir. 2004).

The standard of accrual under the discovery rule is an objective one, *Cascone,* 370 F.3d at 104, and the "reasonable diligence component" of the rule prevents a plaintiff from preserving her claim by "bury[ing] her head in the sand." *Skwira. United States*, 344 F.3d 64, 77 (1st Cir. 2005) (quoting *Diaz v. United States,* 165 F.3d 1337, 1339 (11th Cir.1999)). The duty to investigate required by the discovery rule "is not a negligible one." *Marrapese*, 749 F.2d at 943. Once a Plaintiff is "on inquiry notice as to further aspects of the transaction, and could not simply sit back, without further investigation, and permit the statutory period to lapse." *Id.* at 944.

Here, the Court must reject Plaintiff's attempt to invoke the discovery rule where he knew he had been injured and could—with the exercise of due diligence—have discovered, years before he did, between ▮▮▮▮▮▮ (the date on which Plaintiff reached majority), and ▮▮▮▮▮▮ (the latest possible date for expiration of the statute of limitations period) the basis for his claim against the City Defendants. The Plaintiff possessed "knowledge of the facts sufficient to put him on inquiry notice" that a possible claim could exist against Defendant Dodd's employer. *See Marrapese*, 749 F.2d at 937. The Plaintiff was on "inquiry notice" of his claim involving a BPD officer who it is alleged said

he would help him with the abuse by McKeown and used his power and authority as a police officer to accomplish the sexual abuse. (ECF No. 3-1, ¶¶ 13-15 and 45 ¶¶ 22 and 26). *Id.*; see also *Plumeau v. Sch. Dist. No. 40 County of Yamhill*, 130 F.3d 432, 437 (9th Cir. 1997).[8]

Plaintiff, despite being "extraordinarily focused" on his claim against Dodd between 2005 and 2014 (SMF 358), failed to take any steps to investigate his claim.  Nothing stood in his way except his own conscious decision *not* to act against Dodd until he was 30 years old and had amassed a fortune. (SMF 355-360 and 380-389).  Plaintiff alleges that once he undertook a preliminary investigation into his claims in 2014/2015 he discovered the City Defendant's involvement. (SMF 396).  Had he undertaken the preliminary investigation within the statute of limitations, he would have found the same information. Plaintiff's nearly thirteen-year delay was personal in nature, which is an insufficient ground to permit tolling of his claims.

### 2. Discovery/Accrual Rule Not Applicable Where Lauzon's Own Late Investigation Proves Claims Against City and Chief Were Not "Inherently Unknowable"

To receive leniency under the discovery rule, a plaintiff must establish that the factual basis for his claim was "'inherently unknowable' at the time of the injury." *Attallah*, 955 F.2d at 780 (citation omitted). A wrong can be "inherently unknowable" if it is "incapable of detection by the wronged party through the exercise of reasonable diligence." *Borden v. Paul Revere Life Ins. Co.,* 935 F.2d 370, 376 (1st Cir.1991). Stated otherwise, the phrase describes a cause of action that is incapable of detection for some prolonged period even with the exercise of reasonable diligence. *See, e.g., Tagliente v. Himmer,* 949 F.2d 1, 5 (1st Cir. 1991).

---

[8] A "plaintiff has a duty to use due diligence to discover the party responsible for her injury ... The Plumeaus knew the abuse took place during school hours and on school property and that the abuser was a school district employee. We agree ... that these facts were sufficient to apprise the Plumeaus of their potential claims against the district for failure to supervise [school district employee/abuser] Moore." *Plumeau*, 130 F.3d at 437.

At the threshold, Plaintiff is not entitled to the "inherently unknowable" plank of the discovery rule where his efforts during the limitations period did not rise to "reasonable diligence" or any diligence based on his conscious decision to await his 30th birthday before addressing his sexual abuse. (SMF 354-357). Nor is this a case where the statute of limitations began to run when the factual predicate for a claim against the BPD became apparent to Plaintiff due to his own "blameless ignorance" preventing him from discovering the cause of action earlier. *Nicolazzo v. United States,* 786 F.2d 454, 455-56 (1st Cir.1986). Plaintiff admits he felt liberated to address his sexual abuse as early as May 2005 on the death of his father. (SMF 354).

Yet, between 2005 and 2014 Lauzon did not communicate with anyone connected with the BPD concerning Dodd. (SMF 365).[9] Plaintiff's failure to contact the BPD is another indicium of his lack of reasonable diligence in pursing his claim given his longstanding knowledge of Dodd's connection with the BPD and the role that connection allegedly played in Plaintiff's abuse. (ECF No. 3-1, ¶ ¶ 13-15 and 45 at 22 and 26 SMF 365-66).

Even *assuming* Plaintiff pursued his claim with "reasonable diligence", nothing in the factual record supports Plaintiff's claim that the data Plaintiff "first discovered" during his social media campaign in 2014-2015 rises to the level of facts that were "inherently unknowable" or incapable of detection before the ▓▓▓▓▓▓▓▓ expiration of limitations. Three primary factors support the City Defendants' assertion that Plaintiff's social media discovery was capable of prior detection. First, the individuals providing the information were either known or readily knowable to the Plaintiff.[10] Second, the foundational sources of the information provided were recollections, opinions and

---

[9] Plaintiff had a duty to inquire of BPD or the City regardless of whether the City Defendants had a duty to disclose any particular information. *Z.B. ex rel. Next Friend v. Ammonoosuc Cmty. Health Servs., Inc.,* 2004 WL 1571988, at *8 (D. Me. June 13, 2004), *report and recommendation adopted sub nom. Z.B. ex rel. Kilmer v. Ammonoosuc Cmty. Health Servs., Inc.,* 2004 WL 1925538 (D. Me. Aug. 31, 2004) citing *Cragin v. United States,* 684 F. Supp. 746, 755 (D.Me.1988). As the Plaintiff failed to make any inquiry of the City or the BPD, the discovery rule does not protect him from an untimely filing of his claim. *Id.*

[10] *See supra* pp. 3-4 and accompanying notes regarding Drake and Clark, and p. 4-5 regarding Davis and Devou.

speculations about events, most of which occurred before the statute of limitations was triggered in ▬▬▬▬ and all of which was known before the statute expired in 2009. Third, the nature of the transmittals varied widely from hand-written statements to internet communications, but none of the individuals providing the information were prohibited from sharing the information with the Plaintiff in 2014-20015 or before.

Plaintiff's apparent ability to uncover the information that lead to the claims against the City Defendants after only "preliminary investigations into the claims made in this complaint" supports City Defendants' contention that the information was inherently *knowable* after a reasonably diligent search. (SMF 396).

### 3. The Lack of a Viable Constitutional Liability Finding Against Dodd Precludes the Constitutional Claims Against the City Defendants.

The Plaintiff conceded, by virtue of the alteration of legal claims now set in the Amended Complaint, that his civil rights action against Dodd is time-barred by the six-year statute of limitations.[11] The failure to submit a timely civil rights complaint against Dodd also compels the dismissal of the civil rights claims against them.

In *Nieves*, 241 F.3d at 50, the First Circuit held that a time-barred claim against an individual actor forecloses governmental entity or supervisory liability arising out of the same alleged deprivation of constitutional rights. The City Defendants renew their contention that the holding of *Nieves* and the First Circuit precedent on which it relies compel the dismissal of the Amended Complaint. Moreover, this circuit's rule on governmental entity and supervisory liability is consistent with the Supreme Court's seminal decisions in *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 663 (1978) and *City of Los Angeles v. Heller*, 475 U.S. 796, 797-98 (1986). *Nieves* underscores the First Circuit rule holding that

---

[11] Plaintiff stipulated to the dismissal of his civil rights claim against Dodd on statute of limitations grounds, seeking to hold him liable only for sexual assault, for which there is no limitation by virtue of legislative action prior to the alleged abuse of Dodd. (ECF No. 41 at 3 and 15). For analogous reasons, state law claims against City Defendants were also dismissed. (ECF No. 41 at 4-5).

claims against a municipality must fail where the claims against the individual employee has been dismissed. *Nieves* relies on two prior First Circuit decisions[12] in support of the rule. *Nieves,* 241 F.3d at 50.

In *Nieves*, Judge Selya, writing for the Court of Appeals, confronts a situation like the matter at bar where there will be no finding that the Plaintiffs' constitutional rights were not violated, but the allegations against the line officer were time-barred, thus precluding and finding of an underlying constitutional violation.[13] Judge Selya offered a brief explanation of why the municipal and supervisory claims must fail: based on First Circuit precedent, the underlying claims against the individual officers have been "jettisoned." *Nieves*, 241 F.3d at 50.

The nature of the underlying constitutional claim in *Nieves*, provable or not, was irrelevant. *Nieves* held that a time-barred claim against an individual actor forecloses governmental entity or supervisory liability arising out of the alleged deprivation of constitutional rights by the individual. 241 F.3d at 50.[14]

## II.  Dodd Was Not Acting "Under Color of Law" at the Time of the Plaintiff's Sexual Abuse

---

[12] Under *Evans v. Avery*, 100 F.3d 1033 (1st Cir. 1996) and *Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995) there can be no municipal liability in the absence of a custom or policy which could proximately cause a violation of a person's rights, *Evans*, 100 F.3d at 1040, nor can there be supervisory liability where there is no constitutional violation in the first place. *Martinez v. Colon*, 54 F.3d at 990. Both cases are akin to U.S. Supreme Court precedent in *Heller*, 475 U.S. at 797-98, where the Court ruled that when a jury returned a verdict for defendant police officer in a §1983 claim for unreasonable force, that verdict precluded a verdict against the city and the police commission. *Heller*, 475 U.S. at 797-98.

[13] Plaintiffs in *Nieves* sued officers who arrested him over three years earlier, the chief of police, and the town alleging a conspiracy to deprive them of their constitutional rights. 241 F. 3d at 49. The District Court determined that claims relating to the alleged conspiracy were time barred by Massachusetts' three-year statute of limitation - as to both the individual officers, city and chief of police - and the First Circuit and Court of Appeals upheld the ruling.

[14] *Nieves* controls the outcome of Defendant's motion for summary judgment in this case under the doctrine of "law of the circuit." Generally, a panel in a multi-panel circuit is bound by prior panel decisions closely on point. *See Eulitt ex rel. Eulitt v. Me. Dep't of Educ.*, 386 F.3d 344, 349 (1st Cir. 2004). This doctrine is a corollary of stare decisis as it preserves and protects the judiciary's commitment to finality, stability, and certainty in the law. *United States v. Rodriguez*, 527 F.3d 221, 224 (1st Cir. 2008). The emergence of different views, without more, does not justify a repudiation of circuit precedents. *See, e.g., Rodriguez*, 311 F.3d at 438-39.

A trial judge within the circuit must follow circuit precedent. *Harrison v. Granite Bay Care, Inc.*, No. 2:13-CV-123-DBH, 2014 U.S. Dist. LEXIS 123665, at *2 (D. Me. Sep. 4, 2014), *rev'd by Harrison v. Granite Bay Care, Inc.*, 811 F.3d 36 (1st Cir. 2016).

## A.  Overview and Factual Background

In order to establish constitutional violations under Section 1983 against the City Defendants, Plaintiff must prove that Dodd was acting "under color of state law" at the time of the alleged sexual abuse.  The City Defendants contend that Dodd's conduct was not "under color" as it had no relationship to his BPD duties, occurred without any of the indicia of an "on-duty" police officer and was solely for a private purpose.  Moreover, there is no constitutional duty requiring the City Defendants to protect others from private harm and the record demonstrates no actual or constructive knowledge of Plaintiff's abuse by Dodd.  Each legal issue will be explored following a brief factual outline.

Co-Defendant, Stephen Dodd is a gay man who worked at BPD from 1978-2003. (SMF 20-23 and 28).  Dodd never disclosed his sexual orientation to co-workers or others connected with the BPD and did not engage in sexual activity with any member of the BPD. (SMF 29-35).  At the time of his sexual interaction with Lauzon, Dodd was a patrol shift supervisor with the rank of Sergeant. (SMF 22).

On July 27, 2000, the BPD responded to a complaint by the Lauzon family concerning a telephone call to the house by a known sexual offender, Michael McKeown, which the family believed was harassment. (SMF 66-91).  BPD Detectives and a patrol officer appeared at the Lauzon home and took statements from family members. (SMF 82-93).  Lauzon erroneously believed that Dodd was one of the three BPD officers at his home. (SMF 81, 93 and 95).  That day, Lauzon denied any prior sexual interaction with McKeown, which was untruthful. (SMF 36-65 and 92-116).  The BPD detectives concluded that McKeown had not violated any criminal laws. (SMF 117).  A report was written by the patrol officer concerning his visit to the home, but that report was not read by Dodd. (SMF 118-124).

Sometime "weeks or months later" Dodd and Lauzon connected on the internet, while both

were at their respective homes when Dodd was not on duty. (SMF 125, 135-139, 140-143 and 148-150).  Dodd did not use police equipment to contact the Plaintiff. (SMF 152-153).  Dodd did not conceal his identity as a police officer as it had been acknowledged during the internet connection. (SMF 144-146 and 151).  The two set up a meeting near Plaintiff's home in Biddeford for later in the day. (SMF 164).  Although Lauzon has made various statements that his abuse by Dodd took place between the ages of 13-15 years old, Dodd believed Lauzon was age 16 at the time and of the age of consent. (SMF 126-136 and 157-163).

Dodd was in his private vehicle at the time of the meeting, was off duty from his position as a uniformed patrol supervisor, was not wearing his police uniform and was not carrying his service revolver. (SMF 166, 171-173 and 177).  Dodd was not acting for work-related reasons and he believed his actions toward Lauzon were as a private citizen. (SMF 176-177).  Dodd did not use his official position to exert influence or physical control over the Plaintiff. (SMF 151, 175 and 192-195). Although Lauzon and Dodd initially met in Biddeford, Lauzon did not want to go to Dodd's home, so Dodd drove to a neighboring town, outside the jurisdiction of BPD. (SMF 178-180).

Dodd did not display his badge, did not have his BPD issued service revolver on his person, and he did not promise to act for Lauzon as a police officer. (SMF 148-150 and 173-176).  Lauzon made various statements about feeling threatened by the presence of a gun (SMF 181-191), he acknowledged he was "emotional and exaggerated" when he stated that to Sgt. Greenwood in October 2014, and Dodd never threatened him with a gun (SMF 181-195 and 495).[15]

After the initial encounter Dodd and Lauzon had another sexual interaction "weeks or

---

[15] Lauzon's lack of candor concerning his conflicting statements about the presence of a gun and whether and how it was used played a role in MeOAG declining to prosecute Dodd in a criminal proceeding. (SMF 191-193, 478, 492-497 and 501-502).

months" later in exchange for a case of beer. (SMF 210-218).[16]  As with the initial contact, the second sexual interaction with Dodd occurred near the Lauzon family home, while Dodd was off duty, in civilian clothes, driving his personal vehicle, and acting as a private citizen. (SMF 220-221 and 223-227).  The record fails to demonstrate any indication Dodd was engaged in anything but a private purpose. (Id.).

A third encounter may have been scheduled between Dodd and Lauzon in exchange for payment of money. (SMF 210-219 and 228-234).[17]

### B.  Legal Argument

Section 1983 created a federal cause of action for damages to vindicate alleged violations of federal law committed by individuals acting "under color of state law." 42 U.S.C. § 1983; *see also Wyatt v. Cole,* 504 U.S. 158, 161 (1992) ("[T]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Owen v. City of Independence,* 445 U.S. 622, 650 (1980) (§ 1983 was designed "to provide protection to those persons wronged by the '[m]isuse of power'").

The "under color of state law" requirement is "a jurisdictional requisite for a § 1983 action," *Polk County v. Dodson,* 454 U.S. 312, 315 (1981), which, like its state action counterpart, furthers the fundamental goals of "preserv[ing] an area of individual freedom by limiting the reach of federal law and federal judicial power ... [and] avoid[ing] imposing on the State, its agencies or officials,

---

[16] Although Lauzon has now appeared to settle on having only two sexual interactions with Dodd (SMF 211), he has made various statements to others concerning the nature and extent of his sexual abuse: "over a period of several years…by a police officer" (SMF 208 and 209); sexual interactions with other teenagers while police officers watched (SMF 207); abused by multiple people from middle school through high school (SMF 205 and 235); abused "on a number of occasions" by a police officer (SMF 204); and when initially asked how many sexual encounters he and Dodd had, he responded "less than 10" (SMF 203).

[17] Two other homosexual contacts with Lauzon's contemporaries were allegedly arranged by Dodd for either payment of money to Lauzon or for sexual experimentation and exchange of marijuana. (SMF 11 and 238-260).  Dodd denies arranging sexual activity for Lauzon with his age contemporaries (SMF 248) and one of the contemporaries, Jonathan Clark, has testified he and Lauzon made their own arrangements for potential sexual interaction over the internet which was initiated by Lauzon. (SMF 250-251).  Regardless of the veracity of the claims, neither episodes contain any indicia of action by Dodd "under color" of law.

responsibility for conduct for which they cannot fairly be blamed." *Lugar v. Edmondson Oil Co.,* 457 U.S. 922, 936 (1982). Thus, private conduct that is *not* "fairly attributable" to the governmental entity is simply *not* actionable under § 1983, *Rendell–Baker v. Kohn,* 457 U.S. 830, 838 (1982); *see also D.T. ex rel. M.T. v. Independent School Dist. No. 16,* 894 F.2d 1176, 1186 (10th Cir.), *cert. denied,* 498 U.S. 879 (1990).

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins,* 487 U.S. 42, 49 (1988) (quoting *United States v. Classic,* 313 U.S. 299, 326 (1941)).

1.   **Dodd's Conduct Had No Relationship to His BPD Duties and Occurred for a Private Purpose.**

It is the Plaintiff's burden to plead, and ultimately establish, the existence of a real nexus between the Defendant's conduct and a governmental actor's badge of state authority in order to demonstrate action was taken under color of state law. *Joyola v. Chavez,* 55 F.3d. 488, 494 (10th Cir. 1995). "The key determinant is whether the actor, at the time in question, purposes to act in an official capacity or to exercise official responsibilities pursuant to state law." *Martinez v. Colon,* 54 F.3d 980, 986 (1st Cir. 1995). The fundamental question can be phrased in a slightly different way to the same effect: "whether [the officer's] actions related in some way to the performance of a police duty." *Gibson v. City of Chicago,* 910 F.2d 1510, 1517 (7th Cir. 1990). Ultimately, the governmental actor must have as a purpose to act in an official capacity or to exercises official responsibilities pursuant to state law. *Martinez,* 54 F.3d at 986; *see also David v. City and County of Denver,* 101 F.3d 1344, 1352–53 (10th Cir.1996).

In *Martinez v. Colon,* 54 F.3d 980 (1ˢᵗ Cir. 1995), an on-duty police officer, in uniform, used his service weapon recklessly while bullying a fellow officer and shot him. *Id.* at 982-83. The Court held that such bullying was not under color of law merely because he used his service revolver. *Id.* at 987-

88.   In making this determination, the court considered whether the actions under review were consistent with actions taken by a police officer.  The Court observed that an under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether the officer acts in accordance with his or her duty. *Martinez,* 54 F.3d at 986.  Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties." *Id.*

Here, the totality of the circumstances demonstrate that Dodd was not acting under color of law at the time of his sexual abuse of the Plaintiff.  Although he may have made statements identifying himself as a police officer and wanting to assist after the Plaintiff's denial of McKeown's abuse (SMF 140-147), nothing in his arrival or interaction with the Plaintiff suggested a relationship to his official duties as a member of the BPD. Dodd arrived in civilian clothes, while off-duty, in his personal vehicle and offered the Plaintiff an opportunity to travel to his home, not the police station.

The two did discuss where to proceed after Lauzon was picked up at the designated location near Lauzon's home, and Lauzon rejected the idea of going to Dodd's home. (SMF 164-165 and 178-180).  They ended up leaving the jurisdiction of BPD. (SMF 180).  There was no discussion about what occurred with the Plaintiff and McKeown or of the false oral and written statements Plaintiff made in July 2000. (SMF 195).  Nothing in Dodd's personal interaction after the in-person meeting with the Plaintiff related to Dodd's duties with BPD.  (SMF 178-180 and 194-199).  Dodd himself underscores this by insisting his conduct with Lauzon was as a private citizen. (SMF 176-177).  There was no display of authority by badge or gun and the sexual interaction was commenced following a comment by Dodd that it was "ok to be gay."  (SMF 195).

There are numerous cases in which police officers who are perpetrators of sexual or other misconduct, while either on-duty or off-duty, have been held *not* to be acting under color of state law. *See Latuszkin v. City of Chicago*, 250 F.3d 502, 506 (7th Cir. 2001) (off-duty officer was not acting under

17

color of state law when he killed a pedestrian while driving drunk because he was engaged in entirely private behavior and did not possess any indicia of his office at time of accident); *Halwani v. Galli*, 2000 WL 968219, at *3 (E.D. Pa. July 13, 2000) (on-duty, uniformed police officer did not act under color of law because the altercation arose out of a personal dispute and the officer did not arrest or threaten to arrest the plaintiff); *Parrilla-Burgos v. Hernandez-Rivera*, 108 F.3d 445, 450-51 (1st Cir. 1997) (police officer on medical leave was not acting under color of state law when he displayed his identification, told patrons he was there to keep the peace, and then shot and killed a patron during bar fight); *Roe v. Humke*, 128 F.3d 1213, 1214 (8th Cir. 1997) (school resource police officer's sexual abuse of an eleven-year-old school student on a Saturday while off-duty, driving his private vehicle at a private location was not acting under color in spite of prior on-duty contacts and parental permission to take the child for the particular outing at issue). *See also Almand v. DeKalb County*, 103 F.3d 1510, 1513-15 (11th Cir. 1997) (police officer who gained access to girl's apartment on pretense of discussing police business, left apartment, and then raped girl after forcibly re-entering apartment not acting under color of state law); *Haines v. Fisher,* 82 F.3d 1503, 1508 (10th Cir. 1996) (on-duty police officers who staged a robbery of a convenience store as a practical joke on an acquaintance who worked there did not act under color of law because they did not use their state authority to carry out their plan); *Johnson v. Hackett*, 284 F. Supp.933, 937 (E.D. Pa 1968). (on-duty police officer's instigation of a physical altercation and exchange of insulting names was purely "personal pursuit" and not under color).

Similarly, other, non-law enforcement government actors engaging in misconduct both on-duty and off have been found *not* to be engaging in conduct "under color." *Beedle v. Wilson*, 422 F.3d 1059 (10th Cir. 2005). In *Beedle* a nurse's aide sexually assaulted a heavily sedated hospital patient and was held not to be acting under color because she did not accomplish the assault by the exercise of "state-derived authority" over the patient. *Id.* at 1074. The court reasoned that the aide "engaged in

18

conduct wholly unrelated to her duties and authority as a nurse's aide, conduct that could have been done by anyone who wandered into [the patient's] room." *Id.* at 1074-75. The mere occurrence of the assault, "while abhorrent," was not sufficient to satisfy the "under color of state law" pleading requirement of a Section 1983 claim. *Id.* at 1975. *See also Harris v. Rhodes*, 94 F.3d 196, 197-98 (5th Cir. 1996) (prison maintenance worker who punched inmate's nose not acting under color where incident involved "purely private aim and no misuse of state authority."); *D.T. by M.T. v. Independent School District No. 16 of Pawnee County, Oklahoma*, 894 F.2d 1176, 1186–88 (10th Cir. 1990) (holding that school teachers who perpetrated sexual abuse against students during summer vacation were not state actors, and rejecting the argument that the teacher's "cloak of authority" satisfied the color of law requirement, reasoning that there was no real nexus between the sexual abuse and the public school).

### 2.   There is No Constitutional Duty to Protect the Plaintiff from Private Violence.

If the Amended Complaint implicates a claim of a duty to protect Lauzon from Dodd and a failure to properly execute that duty, such a claim runs afoul of longstanding United States Supreme Court precedent that precludes civil rights liability on a theory of failure to protect an individual against private violence. In *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989), a child sued for damages under the Civil Rights Act, claiming that employees of a state-run social service agency, on notice of a parent's abusive behavior, nonetheless failed to protect the child from the readily foreseeable danger. *Id.* at 193. The Supreme Court held that the Due Process Clause ordinarily does not require the state to protect an individual's life, limb, or property against the marauding of third parties not acting to the state's behalf. *Id.* at 196-197. *See also Castle Rock v Gonzales*, 545 U.S. 748 (2005) (a town and its police department could not be sued under Procedural Due Process theory for failing to enforce restraining order which led to the murder of a woman's children by her estranged husband).

Since *DeShaney*, courts have held that private violence, even private violence engaged in by one

who happens to work for a governmental entity, has different legal ramifications than violence attributable to state action. *Martinez v. Colon*, 54 F.3d 980 (1st Cir. 1995). *DeShaney* has been construed to limit civil rights liability *only* in cases where the government's affirmative acts place a person in a worse position than had it not acted at all: the "state created danger" hybrid of the "duty to protect" theory. *McIntyre v. United States,* 336 F. Supp 2d 87, 114-115 (D. Mass 2004). Stated otherwise, civil rights liability under *DeShaney* would attach only where a state official acts to create or even markedly increase a risk; yet, inaction alone would raise no constitutional violation. Plaintiff's claim here, that the City Defendants took *no* action, even when they should have, insulates them from "duty to protect" liability.

A recent case in the District of Maine noted that to state a claim under the "state created danger" doctrine, a plaintiff must allege that state actors have taken affirmative steps to create or exacerbate the danger posed by a private individual. *Hill-Spotswood v. Mayhew*, 2015 WL 403931, 13-14 (D. Me. Jan. 29, 2015). The Court observed that nonfeasance by a state actor, including unfulfilled or unkept promises to protect, does not deprive an individual of his or her liberty or ability to act. *Id.*

### 3.   There Was No Actual or Constructive Knowledge of Dodd's Abuse of Lauzon.

The Plaintiff alleges that the City Defendants had actual or constructive knowledge of his incidents of abuse. "Imputation of constructive knowledge requires a showing that the underlying unconstitutional misconduct was 'so widespread or flagrant that in the proper exercise of its official responsibilities the governing body should have known of [it].'" *Thelma D. ex rel. Delores A. v. Board of Educ.,* 934 F.2d 929, 933 (8th Cir.1991) (quoting *Spell v. McDaniel,* 824 F.2d 1380, 1387 (4th Cir.1987), *cert. denied,* 484 U.S. 1027 (1988)). The Plaintiff has not made such a showing.

To show actual knowledge, a plaintiff must prove that the state actors "received notice of a pattern of violations of … constitutional rights." *Jojola v. Chavez*, 55 F.3d 488, 490 (10th Cir. 1995). In *Jojola*, a school custodian approached a minor student, "led her into a dark, vacant classroom" and

molested her. *Id.* The complaints against the school principal and superintendent were dismissed where the plaintiffs did not allege that either of them actually knew of the abuse, and no showing of constructive knowledge was made. *Id.* at 491. The plaintiffs alleged "four incidents and other rumors," which the court found did not "demonstrate the requisite pattern of behavior necessary to support imposing liability" against the principal or superintendent. *Id.* *Thelma D.,* 934 F.2d at 933 ("[F]ive complaints scattered over sixteen years cannot, as a matter of law, be said to comprise a persistent and widespread pattern of unconstitutional misconduct"); *Jane Doe "A" ex rel. Jane Doe "B" v. Special Sch. Dist.,* 901 F.2d 642, 646 (8th Cir.1990) (even though various defendants were notified of isolated incidents occurring over a two-year period, no pattern of behavior was shown).

The record fails to demonstrate any constructive knowledge on the part of Chief Beaupre that Dodd was going to abuse him. (SMF 261-266, 269-270 and 295-298).  While Dodd had been investigated by the MSP in 1989 in connection with an allegation of sexual abuse brought by his foster son, Larry Carey, (SMF 522- 552), who was an adult at the time, the allegations were recanted by Carey and denied by Dodd (SMF 541-546), and no action was taken by the District Attorney nor deemed necessary by Chief Beaupre following the prosecutor's decision. (SMF 547-552).  Similarly, Dodd's interaction with Bert Girard was not made known until 2002. (SMF 267-269).  Moreover, the episode involving the adult Girard in the early 1980s over a punctured waterbed at Dodd's apartment (SMF 503-520) were not brought to the Chief's attention at the time. (SMF 521). None of those events create actual or constructive notice for the City Defendants.

### III. Chief Beaupre Is Entitled to Qualified Immunity

### A. Overview and Factual Background

Count II of the Amended Complaint alleges that Roger Beaupre ("Chief Beaupre") is liable in his individual capacity for violation of Plaintiff's constitutional rights. *See e.g., Graham v. Kentucky*, 473 U.S. 159, 166 (1985).  Chief Beaupre asserts in defense the doctrine of qualified immunity,

which protects public officials from liability unless they violated clearly established rights. *Harlow v. Fitzgerald*, 457 U.S. 800, 807, 813-14 and 818 (1982). Chief Beaupre contends that his own individual actions at the relevant times alleged in the Amended Complaint did not violate clearly established constitutional law. *Ashcroft v. Iqbal*, 556 U.S. 662, 667 (2009). Following an outline of the pertinent facts, this memorandum will address the legal issues surrounding supervisory liability and Chief Beaupre's qualified immunity to suit in his individual capacity.

Chief Beaupre is currently the chief of the Biddeford Police Department ("BPD") and has been since 1981.[18]  (SMF 13 and 17).  During Chief Beaupre's tenure as Chief of Police two members of BPD have been accused of sexual misconduct against minors and subject to investigations:  a MeOAG investigation against Norman Gaudette in 1990-1991 (SMF 553-616); and two investigations of Stephen Dodd, one by the MSP in 1989 and another by MeOAG in 2002-2003.  (SMF 19, 24-27, 261-277 and 522-552).

The 1990-1991 MeOAG investigation of Gaudette for sexual abuse of minors did not reveal any evidence of sexual abuse of minors by Dodd. (SMF 616). Moreover, the record fails to establish facts of evidentiary value that Chief Beaupre did anything to interfere, constrain, control, delay, cover-up factual material, or otherwise engage in a violation of the constitutional rights of any individual during the 1990-1991 MeOAG investigation. (SMF 479-480, 565, 573-574, 577, 579-580, 582-584).  The MeOAG prosecutor presented a case involving Gaudette to the York County Grand Jury, which returned a "no bill". (SMF 584-590). Contemporaneous with the Grand Jury presentation, Chief Beaupre authorized an Internal Affairs investigation against Gaudette which did not reveal sufficient evidence to support administrative action. (SMF 591-608).  Chief Beaupre consulted with the City Solicitor and ultimately, Gaudette was required to be reinstated to his former

---

[18] Chief Beaupre is a career law enforcement officer who started at BPD as a patrolman in 1971, and was appointed up the ranks to Sergeant, Lieutenant, Captain and Deputy Chief in 1978. (SMF 15-16).  He has an undergraduate degree in criminal justice and a graduate degree in business administration. (SMF 14).

position. (SMF 609-613).  No further allegations of sexual abuse of minors by Gaudette were made

before the 2014-2015 MeOAG investigation into the Plaintiff's interactions with Dodd.  (SMF 614).

The record reveals no evidence that Chief Beaupre was aware of the sexual abuse of Lauzon

by Dodd during the time-frame it occurred or at any time before Lauzon's report to BPD in

October 2014. (SMF 236-237 and 628-629).  Before the 2002-2003 MeOAG investigation, there

were two episodes of law enforcement interaction with Dodd.  One involved a domestic dispute call

at Dodd's apartment in the mid-1980s between Dodd and a young adult, Bert Girard.  (SMF 503-

521).  The other involved vague allegations of sexual misconduct by Dodd in 1989 made by another

young adult, Larry Carey, Dodd's former foster child who continued living with Dodd.  (SMF 522-

552).  Neither incident gave rise to information that would lead "every reasonable" police officer,

*Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011), to believe that Dodd was engaged in widespread sexual

abuse of minors in Biddeford.

The incident with Girard concerned a call for assistance in the mid-1980s when an adult

Girard was living with Dodd.  (SMF 503-507).  The two men were engaged in some sort of

altercation that resulted in a waterbed owned by Dodd being punctured. (SMF 505 and 508).  BPD

officers responded to the call, a report was written, and no criminal action was pursued because in

the judgement of the responding officer there was no probable cause to arrest anyone. (SMF 509-

513).  At that juncture, no member of the BPD was aware of or had reason to believe that Dodd

had engaged in sexual abuse of Girard at the time. (SMF 515-520).  The information concerning

Girard in the mid-1980s was not brought to Chief Beaupre's attention at the time. (SMF 521).  Even

later, in November 1989, Chief Beaupre did not know Girard. (SMF 534).  For his part, Girard did

not report his sexual abuse by Dodd until almost twenty years later, during the 2002-2003 MeOAG

investigation. (SMF 514).

In November 1989, Larry Carey made vague statements to BPD Deputy Chief Bruce Audie implying that he had been sexually abused by Dodd, which prompted a BPD referral to MeDHHS, the York County District Attorney's Office (YCDAO) and the MSP, in accordance with the BPD policy at the time. (SMF 524 and 526-540). Dodd had taken Larry Carey into his home in 1986 as a foster child and co-parented him with a fellow BPD employee, Ms. Jacquith Godbout. (SMF 522-525). The MSP investigation revealed that Carey recanted his statements about sexual abuse by Dodd, and Dodd denied the allegations to MSP investigators. (SMF 541-546).  The MSP took the results of their investigation to the YCDAO, a decision not to prosecute followed, and Chief Beaupre decided that the results of the MSP investigation did not warrant a separate Internal Affairs investigation. (SMF 548-552).

During the 2002-2003 MeOAG investigation of Dodd, interviews revealed certain individuals made allegations that Dodd had sexually abused them (SMF 267-268 (redacted)), but no information reached the investigators concerning sexual abuse of Lauzon by Dodd. (SMF 269). MeOAG determined that no criminal actions could be pursued against Dodd because the allegations either lacked credible evidence to support criminal charges or the allegations were outside of the applicable statute of limitations.  (SMF 318).  Chief Beaupre, after consulting the City Solicitor, pressed the MCJA to begin a licensing action against Dodd to revoke his law enforcement certificate. (SMF 309-313 and 316-325).

Lauzon made his allegations of sexual abuse by Dodd known to Maine law enforcement for the first time in October 2014.  (SMF 7 and 389-390).  During the 2014-2015 MeOAG investigation, the Plaintiff and his attorney claimed, as part of their social media campaign, that Chief Beaupre should be investigated for conspiracy for "sweeping information under the rug" and protecting Dodd because he was blackmailing Chief Beaupre. (SMF 460-463).  The MeOAG investigation into Plaintiff's speculative theories revealed no information that a conspiracy or coverup existed or that

anyone at BPD was engaged in actions to protect Dodd because of blackmail, and the record establishes that no such admissible evidence has been produced. (SMF 464-468, 630-639 and 653-663 and 665-668).

## B.  Legal Argument

### 1.  Chief Beaupre's Individual Conduct Did Not Violate Plaintiff's Constitutional Rights.

Before *Iqbal*, 556 U.S. 662, supervisors could be individually liable for their own, direct, constitutional misconduct against a person or under a theory of indirect liability in the training, supervision or control subordinates. *Polk County v. Dodson*, 454 U.S. 312, 325-326 (1981).  In *Iqbal*, the Court declared that "the term 'supervisory liability' is a misnomer" and required that "each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Iqbal*, 556 U.S. at 667.  *Iqbal* rejected the claim that a supervisor can be held liable for "knowledge and acquiescence" in their subordinate's conduct because mere knowledge of a subordinate's conduct does not amount to the supervisor violating the Constitution.  *Id.*[19]

The record does not establish that Chief Beaupre was engaged directly in violating Lauzon's constitutional rights or that he was present when another member of the BPD did so.  Thus, the focus of any individual constitutional liability turns on the continuing viability, or not, of supervisory or indirect constitutional liability. The Supreme Court's mandate of *Iqbal* to limiting the liability of supervisors has received a mixed reaction in the Courts of Appeal.[20]Chief Beaupre contends that the undisputed facts here and the precedent either do not permit supervisory liability or, if so, he has a qualified immunity from suit under the circumstances.

---

[19] The First Circuit has acknowledged that *Iqbal* requires that each defendant must violate the Constitution in order for liability to attach.  *Maldonado v. Fontanes*, 568 F.3d 263, 275 n. 7 (1st Cir. 2009).

[20] The First Circuit is among those appellate courts that have so far declined to "recast the contours of supervisory liability in the aftermath" of *Iqbal*.  *See Ramirez v. Lluveras v. Rivera-Merced*, 759 F.3d 10, 19 (1st Cir. 2014). The Court's pre-*Iqbal* opinion in *Whitfield v. Melendaez-Rivera*, 431 F.3d 1, 14 (1st Cir. 2005) is representative of its supervisory liability approach.

Liability of a supervisor cannot be based upon "knowledge and acquiescence" in the constitutional conduct of others. *Iqbal*, 556 U.S. at 667. The Court wrote that "purpose rather than knowledge is required to impose … liability on the subordinate for unconstitutional discriminations; and the same holds true for an official charged with violation arising from his or her superintendent responsibilities." *Id.* As a result of *Iqbal*, a plaintiff must show that a supervisor possessed discriminatory intent in order to adequately state a claim that "a supervisor behaved knowingly or with deliberate indifference that a constitutional violation would occur at the hands of a subordinate." *See, e.g., Dodds v. Richardson*, 614 F.3d 1185, 1204 (10ᵗʰ Cir. 2010) (internal quotations omitted).

Although the First Circuit maintains a theory of indirect, supervisory liability, *Rivera-Merced*, 759 F.3d at 19, its general rules for supervisory liability are worth noting, and bar indirect liability under this record. The tort theory of *respondeat superior* does not allow imposition of supervisory liability under § 1983. *See, e.g., Grajales v. P.R. Ports Auth.,* 682 F.3d 40, 47 (1st Cir. 2012). Further, § 1983 liability cannot rest solely on a defendant's position of authority. *Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 16 (1st Cir. 2011). Proof that a supervisor was negligent is also insufficient. *See, e.g., Ramos v. Patnaude,* 640 F.3d 485, 490 (1st Cir. 2011).

Notwithstanding its failure to abrogate indirect liability, our Court of Appeals emphasizes the heightened sense of proof required. It observed: "[a]fter *Iqbal,* as before, we have stressed the importance of showing a strong causal connection between the supervisor's conduct and the constitutional violation." *Rivera-Merced*, 759 F.3d at 19.[21]

---

[21] A plaintiff must prove causation by showing a "known history of widespread abuse sufficient to alert a supervisor to ongoing violations." *Maldonado–Denis v. Castillo–Rodriguez,* 23 F.3d 576, 582 (1st Cir. 1994). However, proof of that sort must truly show "widespread" abuse; "isolated instances of unconstitutional activity ordinarily are insufficient . . . to show deliberate indifference." *Id.*

"[T]he plaintiff must show that the official had actual or constructive notice of the constitutional violation." *Feliciano-Hernandez v. Pereira-Castillo*, 663 F.3d 527, 533 (1st Cir. 2011).  This record is not sufficient to put Chief Beaupre on notice that Dodd presented a "substantial," "unusually serious," or "grave risk" of sexual abuse of a minor before Lauzon's abuse.  *Rivera-Merced*, 759 F.3d at 19–23.  *See Ruiz–Rosa v. Rullan,* 485 F.3d 150, 157 (1st Cir. 2007); *Figueroa–Torres v. Toledo–Dávila,* 232 F.3d 270, 279 (1st Cir. 2000); *Bowen v. City of Manchester,* 966 F.2d 13, 17 (1st Cir. 1992); *accord Camilo–Robles v. Hoyos,*151 F.3d 1, 7 (1st Cir. 1998).

## 2.    Qualified Immunity Bars the Plaintiff's Individual Capacity Action.

The Supreme Court has long recognized that police officers are protected from liability under 42 U.S.C. § 1983 by the defense of qualified immunity.  *Pierson v. Ray*, 386 U.S. 547, 557 (1967) ("We hold that the defense of good faith and probable cause … available to the officers in the common-law action for false arrest and imprisonment, is also available to them in the action under s 1983.").  That defense "is intended to provide government officials with the ability 'reasonably [to] anticipate when their conduct may give rise to liability for damages.'"  *Anderson v. Creighton,* 483 U.S. 635, 638 (1987).  Applying a standard of liability that allows a court to impose civil rights liability based upon less than affirmative individual conduct is inconsistent with the qualified immunity doctrine. *Id.* (emphasis added).  As with the supervisory liability formulation in *Iqbal*, qualified immunity shields individuals from liability "as long as *their actions* could reasonably have been thought to be consistent with the rights *they are alleged to have violated.*"  *Id.* (emphasis added).

Qualified immunity is a doctrine that accommodates the need to balance "the importance of a damages remedy to protect the rights of citizens" and "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Harlow*, 457 U.S. at 807.  As the Court explained, "government officials performing discretionary functions generally are shielded from liability for civil damages

27

insofar as their conduct does not violate clearly established statutory or constitutional rights … " *Id.* at 818 (citations omitted).[22]  In *al-Kidd*, 563 U.S. at 741 the Supreme Court held:

> A government official's conduct violates clearly established law when, at the time of the challenged conduct, '[t]he contours of [a] right [are] sufficiently clear' that every 'reasonable official would have understood that what he is doing violates that right.' We do not require a case directly on point, but existing precedent must have placed the statutory of constitutional question beyond debate.

(quoting *Anderson*, 483 U.S. at 640).

Qualified immunity involves two distinct questions. First, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). And second, "if a violation could be made out on a favorable view of the parties' submissions," was the right "clearly established" in a particularized sense (meaning that it must have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted")? *Id.* at 201-02. The qualified-immunity analysis is essentially the same regardless of whether a defendant seeking immunity is a supervisor or subordinate. In each, the relevant question is whether every reasonable official in a defendant's position would understand his alleged conduct to be illegal.

The record contains no evidence in support of Plaintiff's general assertion that Chief Beaupre's failure to adequately train, supervise, or reprimand Dodd constitute reckless or callous indifference. Further, the record establishes no affirmative link between Chief Beaupre's acts or omissions and Dodd's alleged violation of Lauzon's constitutional rights.[23]  *See Santana-Castro v.*

---

[22] Defendant does not challenge the notion that *Dodd's* sexual abuse of Lauzon (the occurrence of which it assumes for purposes of this motion), could have constituted a violation of clearly established constitutional rights. *See, e.g. Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013) (recognizing that a woman's "right to bodily integrity, which is a substantive due process" right, was violated when she was sexually assaulted by a police officer); *Abeyta ex rel. Martinez v. Chama Valley Indep. Sch. Dist. No. 19*, 77 F.3d 1253, 1255 (10th Cir. 1996) ("Sexual assault or molestation by a school teacher violates a student's substantive due process rights"). Defendant's assumption here does not concede that Chief Beaupre's own conduct violated Plaintiff's right to bodily integrity.

[23] *See supra* note 22.

*Toledo-Davila*, 2008 WL 11424095, at \*4–5 (D.P.R. May 13, 2008), *order amended on reconsideration*, 2008 WL 11424094 (D.P.R. June 9, 2008), *and aff'd*, 579 F.3d 109 (1st Cir. 2009).  Chief Beaupre did not engage in any tacit or explicit ratification of Dodd's prior sexual abuse.  Indeed, upon learning of Dodd's alleged wrongdoing, he directed the matter be investigated, and eventually assisted in forcing a conclusion to Dodd's law enforcement career.  (SMF 316-325, 326-335 (redacted) and 344-351).  *See, e.g., M.S. v. Belen Consol. Sch. Dist.*, 2017 WL 3057662, at \*6–8 (D.N.M. July 18, 2017), *appeal dismissed sub nom. M.S. v. City of Belen,* 2017 WL 7410291 (10th Cir. 2017).  More importantly, the record does not establish that Chief Beaupre "knew or reasonably should have known" that Dodd was sexually assaulting Lauzon in the pertinent period. Regardless of how Plaintiff characterizes Chief Beaupre's conduct in administering departmental affairs involving internal and external investigations, it is an unjustified leap to infer that Chief Beaupre knew Dodd was sexually abusing Lauzon.  *See Rall v. Hobbs Municipal School District*, 2016 WL 10588124 (D.N.M. March 16, 2016).

## Conclusion

The City Defendants respectfully request that this Court grant their Motion for Summary Judgment.

Dated at Kennebunk, Maine this 4th day of March 2018.

 */s/ Michael E. Saucier*
Michael E. Saucier, Esq.
Attorney for City Defendants

Libby, O'Brien, Kingsley & Champion
62 Portland Road
Suite 17
Kennebunk, ME 04043-0147
(207) 985-1815

## CERTIFICATE OF SERVICE

I, Michael E. Saucier, Esq., hereby certify that on March 4, 2018, I electronically filed the foregoing City Defendants' Partial Motion for Summary Judgment and Memorandum of Law in Support, with the Clerk of Court using the CM/ECF system, which will send notification of such filing(s) to all attorneys and parties listed below:

Attorney for Matthew Lauzon & Lawrence Ouellette
Walter F. McKee, Esq.
McKee Billings
133 State Street
Augusta, ME 04330
wmckee@mckeelawmaine.com

Attorneys for Stephen Dodd in the Lauzon Case
Joseph L. Cahoon, Jr., Esq.
Richardson Whitman Large & Badger
P.O. Box 9545
Portland, ME 04112-9545
jcahoon@rwlb.com

Attorney for Roger Beaupre
Timothy J. Bryant, Esq.
Preti Flaherty
One City Center
Portland, ME  04101
tbryant@preti.com

Attorney for the City of Biddeford in the Girard & Ouellette Cases
Keith Jacques, Esq.
Woodman Edmands Danylik Austin Smith & Jacques
234 Main Street
P.O. Box 468
Biddeford, ME  04005
krj@woodedlaw.com

Attorneys for Norman Gaudette
Gene R. Libby, Esq. and Tyler Smith, Esq.
Libby O'Brien Kingsley & Champion, LLC
62 Portland Road, Suite 17
Kennebunk, ME  04043
glibby@lokllc.com
tsmith@lokllc.com

<u>Attorney for Bertrand Girard</u>
Anthony J. Sineni, III, Esq.
Senini Law Offices
701 Congress Street
Portland, ME 04102
Anthony@sinenilaw.com

Stephen Dodd, *Pro Se*
smd@maine.rr.com

Dated:  March 4, 2019                           /s/ Michael E. Saucier
                                                Michael E. Saucier, Esq.
                                                Attorney for City Defendants

LIBBY O'BRIEN KINGSLEY & CHAMPION, LLC
62 Portland Road, Suite 17
Kennebunk, ME 04043-0147
Tel. (207) 985-1815
Email:  msaucier@lokllc.com

31